In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

No. 16-3253

RODNEY WASHINGTON,

*Petitioner-Appellant*,

*v.*

GARY A. BOUGHTON, Warden,
Wisconsin Secure Program
Facility,

*Respondent-Appellee*.

———————————

Appeal from the United States District Court for the
Western District of Wisconsin
No. 3:14-cv-00208-wmc — **William M. Conley**, *Judge*.

———————————

ARGUED JANUARY 10, 2018 — DECIDED MARCH 8, 2018

———————————

Before WOOD, *Chief Judge*, HAMILTON, *Circuit Judge*, and
BUCKLO, *District Judge*.[*]

BUCKLO, *District Judge*. A Wisconsin jury convicted Rodney Washington of multiple counts of first-degree sexual assault with the use of a dangerous weapon and other crimes. Washington appealed his conviction, arguing that the crimi-

———————————

[*] Of the Northern District of Illinois, sitting by designation.

nal complaint that triggered his prosecution was legally in-
sufficient under Wisconsin law; that his trial attorney was
ineffective for failing to seek dismissal of the complaint on
that ground; and that the trial court deprived him of his con-
stitutional right to self-representation. After exhausting
these claims in state court, Washington sought federal habe-
as corpus relief. The district court denied his petition.

For the reasons explained below, we conclude that nei-
ther Washington's due process challenge to the state appel-
late courts' treatment of his claim based on the sufficiency of
his charging documents nor his ineffective assistance of
counsel claim entitles him to habeas relief. We are con-
vinced, however, that the state courts' denial of his request
to proceed *pro se* cannot be squared with *Faretta v. California*,
422 U.S. 806 (1975). Accordingly, we reverse.

I.

On March 16, 2000, the State of Wisconsin filed a "John
Doe" criminal complaint charging an unknown individual
with sexually assaulting five women between March 27,
1994 and January 14, 1995. Although the defendant's identity
was unknown, the Wisconsin State Crime Laboratory had
obtained evidence of his genetic code from semen samples
taken from the victims' bodies and clothing. By comparing
the DNA profiles developed from those samples, the State
Crime Lab determined that the same individual was respon-
sible for all five of the assaults. Indeed, the criminal com-
plaint stated that the DNA profiles developed from the five
semen samples "match[ed]" at all of the genetic locations for
which DNA profiles had been developed. Accordingly, the
complaint identified the defendant with reference to those
genetic locations, describing him as "Doe, John #5, Unknown

Male with Matching Deoxyribonucleic Acid (DNA) Profile at Genetic Locations D1S7, D2S44, D4S139, D5S110, D10S28, and D17S79." An arrest warrant describing John Doe #5 in the same manner was issued the same day.

On June 25, 2007, a databank unit leader at the State Crime Lab matched Washington's DNA to the DNA from the semen obtained from the five sexual assault victims. Shortly thereafter, the state amended its complaint, naming Washington as the defendant and describing his specific DNA profile as a series of numbers (known as "alleles") at several genetic locations.[1]

Washington was appointed counsel. During pre-trial proceedings, Washington expressed dissatisfaction with his counsel's performance and told the court that he wanted to represent himself. Four months before trial, he filed a written submission stating that unless his lawyer moved to dismiss the case prior to a hearing scheduled for February 14, 2008, he would seek to proceed *pro se*. True to his word, Washington told the court at that hearing, "I just want to go *pro se* in this case and defend myself." Although he withdrew his request the same day after conferring with his counsel, he revived it on the morning of April 28, 2008—the

---

[1] Illustrating the difference, the amended complaint describes the defendant as "Rodney Washington, DOB 3/31/58; Formerly Known as Doe, John #5, Unknown Male with matching Deoxyribonucleic Acid (DNA) Profile at Genetic Locations D127, D2S44, D4S139, D5S110, D10S28, and D17S79 and Further Identified with Matching DNA profile at Genetic Locations D3S1358(16), vWA(15,16), FGA(19, 26), D8S1179(14), D21S11(28), D18S51(15, 20), D5S818(8,13), D13S317(12, 13), D7S820 (10, 11), D16S539 (12, 13), THO1(6, 9, 3), TPOX (8, 10), AND CSF1PO(12)."

day his trial was scheduled to begin—insisting, "I'm going *pro se* in this case, Your Honor."

The court confirmed that Washington wished to represent himself, prompting the following colloquy:

> The Court:   Okay. But you understand that by doing so you would have to comply with any and all the rules of the court and rules of evidence and case law, do you understand that?
>
> Defendant:   I have no problem with that.
>
> The Court:   Well, do you know the rules of evidence, sir?
>
> Defendant:   Do I what?
>
> The Court:   Know the rules of evidence?
>
> Defendant:   When they are brought to my attention, I will know.
>
> The Court:   So that would certainly help to have a lawyer help you do that.
>
> Defendant:   It won't be this one.
>
> The Court:   Well, here is the problem with proceeding pro [se] like you want to, and you have a right to do that unless the court doesn't feel that you're competent to do that and the court doesn't believe that you're competent to do that and I'll tell you why, because of the DNA. The DNA that's involved in this case which is scientific and very few people outside

the legal profession and scientists know how that works. And in order to develop and cross-examine those witnesses, you have to have some knowledge in doing that. Even if you knew some of the rules of evidence and were capable in other ways in order to represent yourself, that's a big issue. And it becomes problematic, also problematic also since this is a sexual assault case for you to quite frankly cross-examine the witnesses.

Defendant:    I have a right to face my accusers.

The judge denied Washington's request, and the case proceeded to trial with Washington represented by a lawyer he didn't want. He was convicted and sentenced to 100 years in prison.

Washington's first appellate lawyer filed a "no-merit" appeal, to which Washington filed a *pro se* response. The Court of Appeals of Wisconsin asked Washington's lawyer to respond to several of the issues Washington raised, including "whether the arrest warrant or complaint identified Washington sufficiently to toll the statute of limitations," and "whether the trial court erred by denying Washington's request to proceed without counsel." Rather than proceed with these issues on appeal, Washington moved, through new counsel, to dismiss the appeal and present his claims in a post-conviction motion.

Washington's post-conviction motion asserted that his trial counsel was ineffective for failing to seek dismissal of

the proceedings for lack of jurisdiction. He argued that be-
cause the DNA information in the John Doe complaint and
arrest warrant did not identify him with reasonable certain-
ty, it did not toll the statute of limitations, rendering the
amended complaint untimely. The court denied the post-
conviction motion after an evidentiary hearing that included
extensive DNA testimony.

In a consolidated appeal, Washington challenged the trial
court's denial of his request to represent himself and the
post-trial court's rejection of his related claims alleging in-
sufficiency of the complaint and arrest warrant and ineffec-
tive assistance of counsel. The Wisconsin Court of Appeals
affirmed the post-trial decision on the ground that the John
Doe complaint and arrest warrant satisfied the requirements
of Wisconsin law under *State v. Dabney*, 663 N.W.2d 366
(Wis. Ct. App. 2003), and *State v. Davis*, 698 N.W.2d 823
(Wis. Ct. App. 2005). *State v. Washington*, 2013 WI App 55
(Wis. App. 2013) (unpublished). Because Washington's chal-
lenge to the charging documents lacked merit, the court ex-
plained, his lawyer was not ineffective for failing to pursue
it.

The state appellate court went on to affirm the denial of
Washington's request to represent himself. It agreed that
Washington was not competent to proceed *pro se*, adding its
own reasons to support the trial court's conclusion. Like the
trial court, the appellate court believed Washington unable
to defend against the state's DNA evidence, reasoning that
Washington's "irrational and disruptive" pre-trial conduct
reflected his inability to understand and focus on a critical
part of the case. The appellate court further noted that Wash-
ington's desire to represent himself was grounded in a belief

that his attorney was complicit with the prosecutor and the trial court in "fabricating" his arrest warrants, and that his "obsession with a conspiracy theory led to frequent disruptions in the courtroom."

After exhausting his state court remedies, Washington turned to federal court seeking a writ of habeas corpus under 28 U.S.C. § 2254. The district court denied his request. It first concluded that any constitutional claim potentially encompassed in Washington's challenge to the John Doe criminal complaint and arrest warrant was procedurally defaulted because Washington failed to present it as such in the state proceedings. The court acknowledged that a state indictment alleged to be "so defective that the convicting court had no jurisdiction" could implicate constitutional concerns cognizable on habeas review. But because Washington explicitly rested his claim solely on state law grounds, it fell outside the scope of the court's authority to grant relief.

The district court also rejected Washington's ineffective assistance of counsel claim, agreeing with the state appellate court that the claim Washington faulted his attorney for omitting was "doomed by preexisting authority." Finally, the district court rejected Washington's *Faretta* claim. It concluded that the record supported the Wisconsin appellate court's determination that Washington was incompetent to represent himself, pointing to his "irrational arguments" and "disrespectful, disruptive behavior during the proceedings." 2016 WL 4382770, at *7.

We granted a certificate of appealability to review each of the foregoing claims.

## II.

Washington's lead argument is that the Wisconsin Court of Appeals violated the Due Process Clause when it held that the John Doe complaint and arrest warrant were sufficient, under Wisconsin law, to satisfy the requirements of personal jurisdiction and toll the statute of limitations. His constitutional theory is that the court reached its conclusion by applying Wisconsin law in a manner "unexpected and indefensible by reference to preexisting law." In Washington's view, the state appellate court's decision violates *Bouie v. City of Columbia*, 378 U.S. 347 (1964), which prohibits the retroactive application of an unforeseeable state-court construction of state law.

The State offers a cascade of arguments for rejecting this claim without reaching its merits: first, that Washington procedurally defaulted the claim by failing to raise it in the state proceedings, and that his procedural default is not excused by the alleged ineffectiveness of his counsel; second, that if, as Washington now contends, his due process claim did not accrue until the Wisconsin Court of Appeals issued its decision, then it is unripe for federal habeas review because he has not exhausted his state court remedies[2]; and third, that

---

[2] Actually, the State does not assert failure to exhaust as an independent basis for denying Washington's petition, but it raises the issue in response to Washington's alternative argument that if his due process claim is procedurally defaulted, the default is excused by his counsel's failure to raise it in state court. The State's submissions do not address whether state remedies remain available for Washington to pursue his due process claim in state court. If they do, failure to exhaust is the more appropriate objection to Washington's due process claim; if not, it is procedural default. *See Perruquet v. Briley*, 390 F.3d 505, 514 (7th Cir. 2004). Because we deny Washington's due process claim on the merits, howev-

Washington forfeited his due process claim by failing to raise it in his *pro se* habeas petition to the district court. Rather than work our way through the maze of these procedural arguments, however, we think it best to cut to the chase and deny Washington's due process claim on the merits.

We pause here to confirm that this approach is consistent with the interests of comity, finality, federalism, and judicial efficiency that are at the heart of both the exhaustion requirement and the procedural default doctrine. *See Davila v. Davis*, 582 U.S. ----, 137 S. Ct. 2058, 2064 (2017); *Perruquet v. Briley*, 390 F.3d 505, 513–15 (7th Cir. 2004). Indeed, while the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") codifies these principles by narrowly circumscribing a federal court's authority to *grant* habeas relief to a prisoner in state custody, it expressly authorizes a federal court to *deny* an unexhausted claim on the merits. 28 U.S.C. § 2254(b)(2). Similarly, procedural default is an affirmative defense that does not restrict our jurisdiction, *Trest v. Cain*, 522 U.S. 87, 89 (1997); *Lewis v. Sternes*, 390 F.3d 1019, 1029 (7th Cir. 2004), and our election to forgo a procedural default inquiry to uphold the state court's judgment on the merits accords at least the same finality and respect for that judgment and for our system of federalism as declining to reach the merits at all. Finally, there is no dispute that we have discretion to overlook any forfeiture of Washington's due process claim based on his failure to raise it in the district court. *See United States v. Bailey*, 777 F.3d 904, 908 (7th Cir. 2015).

---

er, we need not decide which procedural objection, if any, better suits Washington's claim.

These considerations, coupled with the purely legal nature of Washington's due process claim, counsel in favor of its swift disposition on the merits. Indeed, given that our ultimate disposition of Washington's petition is likely to result in further proceedings in state court, leaving unresolved the merits of a claim that requires no additional factual development, and that has been fully briefed and ably argued in this court, will almost certainly engender needless reduplication of the proceedings.

This brings us to the substance of Washington's due process claim. Washington's theory is that the Wisconsin Court of Appeals exceeded *Bouie*'s "limitations on *ex post facto* judicial decisionmaking" when it held that the John Doe criminal complaint and arrest warrant were sufficient under *Dabney* and *Davis*. *Rogers v. Tennessee*, 532 U.S. 451, 456 (2001). In Washington's view, the state appellate court's application of *Dabney* and *Davis* departed so radically and unexpectedly from Wisconsin law as it had previously been expressed that it violated due process. The effect of the court's "unexpected and indefensible" decision, Washington argues, was to retroactively revive an expired statute of limitations. We review this claim *de novo*. *See Cone v. Bell*, 556 U.S. 449, 472 (2009) (federal court reviews *de novo* habeas claims the state courts did not reach on the merits); *Freeman v. Pierce*, 878 F.3d 580, 586 (7th Cir. 2017) (argument first raised in federal habeas proceedings is "due no AEDPA deference"); *Perruquet*, 390 F.3d at 518 (where "there is no state-court decision we can look to for an evaluation" of the claim, federal habeas court's review is *de novo*).

For well over a century, Wisconsin law has authorized the prosecution of a defendant whose name is unknown,

provided the "best description of the person" is given in the complaint and warrant. *Scheer v. Keown*, 29 Wis. 586, 588 (Wis. 1872). Wisconsin has refined this principle in the statutory requirement that a warrant "designate the person to be arrested by any description by which the person to be arrested can be identified with reasonable certainty." WIS. STAT. § 968.04(3)(a)4. Additionally, the complaint must set forth "a written statement of the essential facts constituting the offense charged, WIS. STAT. § 968.01(2), and must indicate who is being charged, with what offense, and why. *See State ex rel. Evanow v. Seraphim*, 161 N.W. 2d 369, 372 (Wis. 1968).

In *State v. Dabney*, the Wisconsin Court of Appeals applied these principles to determine the adequacy, for jurisdictional and limitations purposes, of a criminal complaint and warrant issued against a suspect known only by his DNA. 663 N.W. 2d 366, 370-71 (Wis. Ct. App. 2003). Observing that "a DNA profile is arguably the most discrete, exclusive means of personal identification possible," the court held that a complaint and warrant that set forth "a specific DNA profile" were adequate under Wisconsin law. *Id*. at 372. In *State v. Davis*, the court reaffirmed that "the State is permitted to file a complaint, which identifies the defendant only by his DNA profile." 698 N.W. 2d 823, 831 (Wis. Ct. App. 2005). On the authority of these cases, the state appellate court held that the John Doe complaint and warrant issued against Washington were sufficient to confer jurisdiction, so the proceedings against him were timely filed.

Washington does not claim that *Dabney* and *Davis* themselves represent a departure from Wisconsin's longstanding rule that the state must provide "the best description" of the

defendant. He insists, however, that in 1994 and 1995, when the crimes he was charged with were committed, he could not reasonably have anticipated that a complaint and warrant containing only the identifying information set forth in the John Doe complaint and warrant would be deemed to satisfy that standard. He argues that unlike the instruments in *Dabney* and *Davis*, "not only did the John Doe complaint and warrant not give the best description of the defendant available, they gave no description at all." But this characterization is not consistent with the record.

Washington homes in on the state appellate court's observations that "John Doe #5's actual DNA profile was not included anywhere in the complaint," and that "the complaint and arrest warrant did not include a DNA profile, but rather, only included the locations of six DNA markers that are common to all human beings." But these statements must be viewed in context. The court went on to explain that the narrative portion of the complaint described in detail the forensic analysis performed on semen samples recovered from the five sexual assault victims and determined that the same individual had committed the crimes. Specifically, the complaint explained that the Wisconsin State Crime Lab developed DNA profiles for several genetic locations from each semen sample and determined that the DNA profiles "matched" one another at each of the locations. It further stated that the probability of randomly selecting an unrelated individual whose DNA profile matches the DNA profiles developed from the semen samples was, at most, one in 130 billion. Based on this information, the state filed a complaint against John Doe #5, whose identity was unknown, but whose DNA profile at the specified locations was known to

"match" the corresponding DNA profiles recovered from the sexual assault victims.

Washington's suggestion that the complaint and warrant do no more than describe the defendant as having unspecified genetic material at each of six universally common genetic locations overlooks the narrative portion of the complaint entirely. It also ignores the meaning of the word "matching" in both the complaint and the warrant. When the instruments are read together and in their entirety, the word "matching" means that the specific genetic markers at the identified locations on John Doe #5's genetic code are the same as the genetic markers found at those same locations on the genetic code of the assailant, as determined based on an analysis of his semen.

It is true that the complaint and warrant did not describe the genetic markers using numbers to represent the discrete "allele systems" observed at the identified genetic locations, as the amended complaint would later do. Indeed, as the DNA expert who testified at the hearing on Washington's post-conviction motion explained, the DNA technology in use at the time the John Doe complaint and warrant were issued "just was not advanced enough" to do so. Nevertheless, the Wisconsin State Crime Lab was able, using the technology available at the time, to determine that John Doe #5's genetic information "matched" the genetic information developed from the semen samples taken from the five sexual assault victims. Accordingly, the complaint and warrant identified the defendant "with particularity and specificity" by describing John Doe's DNA profile as "matching" DNA profiles they developed using the method then in use.

That is indeed how the Wisconsin Court of Appeals understood the use of the word "match[ing]" in the 2000 complaint and warrant. The court further understood that this description applied to fewer than one in 130 billion unrelated individuals. Accordingly, the court's observation that the complaint did not include the defendant's individual DNA profile is best understood as an acknowledgment that the complaint did not refer to the defendant's genetic information in terms of "alleles," as the amended complaint later did based on the more advanced DNA technology in use at the time. But nothing in Washington's argument persuades us that when the term "matching" is properly understood and the complaint is read as a whole, the description of John Doe #5 in the 2000 charging instruments as having a "matching" DNA profile at the specified genetic locations was not in fact the "best description" available.

To be sure, an individual presented with the John Doe complaint and warrant issued in this case would have no immediate way of knowing whether he was the individual charged. That is, he could not know, without additional inquiry, whether his DNA profile "matches" the DNA profile the State Crime Lab developed based on semen collected from the victims. But we think it highly unlikely that an individual presented with documents identifying the person charged by the alleles observed at specific locations on his genetic code would have any better idea, without further investigation, whether the defendant was himself. Yet, *Dabney* and *Davis* confirmed that that information was sufficient to provide "the best description available" as required by Wisconsin law. Washington does not suggest that due process requires more.

Because we see little practical distinction between the identifying information set forth in the John Doe charging instruments in this case and the ones examined in *Dabney* and *Davis*, we discern no constitutional error in the state appellate court's conclusion that those cases were dispositive. The state court's extension of those cases to the materially similar facts here was not an "unexpected and indefensible" departure from established Wisconsin law, but rather within the permissible scope of "incremental and reasoned development of precedent that is the foundation of the common law system." *Rogers v. Tennessee*, 532 U.S. 451, 461 (2001). Accordingly, there was no due process violation under *Bouie*.

## III.

Our analysis of Washington's ineffective assistance of counsel claim may be brief. Washington's theory is that his state-appointed lawyer performed deficiently by failing to move for dismissal of the proceedings on the ground that the trial court lacked personal jurisdiction over him. The Wisconsin Court of Appeals resolved this claim on the merits under *Strickland v. Washington*, 466 U.S. 668 (1984). Accordingly, our review is "doubly deferential." *Hinesley v. Knight*, 837 F.3d 721, 732 (7th Cir. 2016) (*Strickland* inquiry is "highly deferential" to counsel's plausible strategic choices, and federal habeas review under § 2254(d) is "highly deferential" to state court's decision).

The state appellate court rejected Washington's ineffective assistance of counsel claim on the ground that *Dabney* and *Davis* foreclosed the argument he faulted his lawyer for failing to assert. Because that conclusion rests on an interpretation of state law, it is iron-clad on habeas review. *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("it is not the province of a

federal habeas court to reexamine state-court determinations on state-law questions."); *Ben-Yisrayl v. Buss*, 540 F.3d 542, 555 (7th Cir. 2008) ("[w]e are bound by a state court's interpretations of state law."). As the state court correctly observed, an attorney is not ineffective for failing to raise a meritless argument. *See Stone v. Farley*, 86 F.3d 712, 717 (7th Cir. 1996). Accordingly, the error Washington attributes to his lawyer does not entitle him to habeas relief.

## IV.

Washington's final claim is that the trial court's refusal to allow him to represent himself violated *Faretta v. California*, 422 U.S. 806 (1975). We agree and hold that the state appellate court's conclusion to the contrary unreasonably applied the Supreme Court's decision in that case.

The record suggests three reasons for the trial court's determination that Washington was not competent to represent himself: first, that he was unfamiliar with the rules of evidence; second, that he was ill-equipped to deal with the state's DNA evidence; and third, that it would be "problematic" for him to cross-examine the state's witnesses. Without commenting on the first or third of these reasons, the state appellate court endorsed the second, reasoning that Washington's "irrational and disruptive" behavior leading up to trial evidenced an inability "to understand and decipher" the state's DNA evidence. The appellate court further concluded that Washington's "inability to recognize and follow courtroom decorum or to identify and argue legitimate legal issues in his own defense" supported the lower court's determination that Washington "would not be able to properly focus on and understand the complicated DNA evidence that was critical to the State's case."

A preliminary scan of the authorities the appellate court relied upon for its analysis does not bode well for its conclusion. With no mention of *Faretta* or the line of Supreme Court precedent it engendered on the subject of self-representation, the Wisconsin Court of Appeals relied almost exclusively on *State v. Klessig*, 564 N.W. 2d 716 (Wis. 1997), which state courts have interpreted as authorizing a heightened competency standard whose application we have criticized in several recent decisions, *see Tatum v. Foster*, 847 F.3d 459, 467 (7th Cir. 2017); *Imani v. Pollard*, 826 F.3d 939 (7th Cir. 2016), and on *State v. Imani*, 786 N.W.2d 40 (Wis. 2010), a decision that we later held was contrary to and unreasonably applied *Faretta*.

Undoubtedly perceiving the precarious footing on which the state court's decision rests, the State defends it on the ground that *no* Supreme Court has clearly established "whether, or under what circumstances, a trial court could deny a demand for self-representation." So, the State reasons, the Wisconsin appellate court's decision cannot have violated any "clearly established" federal law. But as the State concedes, this argument cannot be squared with our decisions in *Imani* and *Tatum*, both of which similarly involved Wisconsin state prisoners denied the right to self-representation on grounds including their putative lack of competence. In both cases, we held that the Wisconsin courts violated the clearly established rule of *Faretta* that a court may not force a lawyer upon a defendant based on his perceived lack of education, experience or legal knowhow.

As we explained in *Tatum*, *Faretta* stands for the basic principle that a state may not constitutionally "hale a person into its criminal courts and there force a lawyer upon him,

even when he insists that he wants to conduct his own defense." 847 F.3d 459, 464 (quoting *Faretta*, 422 U.S. at 807). While a defendant seeking to waive his Sixth Amendment right to counsel must do so "knowingly and intelligently," and so must be mentally competent to make that decision, the Court made clear that the defendant's "technical legal knowledge" is irrelevant to the court's assessment of his competency. *Id*. at 835, 36. The Court's subsequent decisions involving self-representation confirm that the focus of the inquiry is on the defendant's mental competency, or as the Court sometimes calls it, his "mental functioning." *Godinez v. Moran*, 509 U.S. 389, 404 (1993).

In *Godinez*, the Court held that the competency standard for pleading guilty or waiving the right to counsel is no higher than the basic competency standard for standing trial. Emphasizing that "the competence that is required of a defendant seeking to waive his right to counsel is the competence to *waive the right*, not the competence to represent himself," *id*. at 399 (original emphasis), the Court reaffirmed *Faretta*'s holding that a defendant's "ability to represent himself has no bearing upon his competence to *choose* self-representation." *Id*. at 400 (original emphasis). Accordingly, the Court explained, so long as a defendant competent to stand trial effectuates a "knowing and voluntary" waiver of his right to counsel, no further inquiry into his ability to represent himself was required. *Id*. at 400-01.

It is true that *Godinez* does not *prohibit* states from additional inquiry, as the Court acknowledged in *Indiana v. Edwards*, 554 U.S. 164 (2008). In *Edwards*, the Court acknowledged a category of "gray area" defendants who are competent to stand trial, but whose mental illness or disability ren-

ders them incompetent to conduct trial proceedings without the assistance of counsel. *Id*. at 172. The Court concluded that states may insist upon trial counsel for gray-area defendants. *Id*. at 174-176.

*Edwards* did not, however, "introduce[] the possibility of taking into account the defendant's legal knowledge," as the Court's emphasis remained on the defendant's mental competence. *Tatum*, 847 F.3d at 465. Indeed, *Edwards* involved a defendant suffering from a well-documented, "severe mental illness" that at times caused "delusions and marked difficulties in thinking" and was manifest in his incomprehensible *pro se* submissions to the court. *Id*. at 168, 178, 179 (App'x). The Court reasoned that allowing a defendant who was fit to stand trial but who nevertheless lacked the mental capacity to "carry out the basic tasks needed to present his own defense without the help of counsel" would call into question the fundamental fairness of proceedings in which he was unrepresented. *Edwards*, 554 U.S. at 177-78.

In *Imani*, *Tatum*, and a third case, *Jordan v. Hepp*, 831 F.3d 837 (7th Cir. 2016), we synthesized the principles emerging from *Faretta*, *Godinez*, and *Edwards* as they bear on the Wisconsin courts' application of *Klessig*. For example, we observed in *Imani* that while the *Godinez* Court held that states "are free to adopt competence standards that are more elaborate," 826 F.3d at 946 (quoting *Godinez*, 509 U.S. at 402), this flexibility is not without limits, and that *Faretta* and *Edwards* "set the relevant benchmarks." *Id*. at 947. We also acknowledged that *Edwards* authorizes states to impose a higher competency standard on "gray-area" defendants suffering from mental illness or disability, but we declined to "stretch *Edwards*" by applying the gray-area standard to Imani, who

"had a high school education, was literate, and was able to understand the trial judge's warnings about what he was getting himself into," when the record revealed no evidence of any mental illness or disability. *Id*. at 943, 946. Because from all that appeared, Imani's abilities were materially indistinguishable from Faretta's, we held that the Wisconsin Supreme Court's decision was contrary to, and an unreasonable application of *Faretta*. *Id*. at 947.

Similarly in *Tatum*, we concluded that the Wisconsin Supreme Court's application *Klessig* was contrary to, and an unreasonable application of, *Faretta* and its progeny. 847 F.3d at 469. As in *Imani*, nothing in the record "suggest[ed] that Tatum suffered from deficient mental functioning, as opposed to a limited education." *Id*. at 467. Accordingly, we concluded that the Wisconsin Supreme Court had "strayed from the 'mental functioning' sense of competence over to educational achievement and familiarity with the criminal justice system." *Id*. To illustrate the distinction, we contrasted Tatum's circumstances with those at issue in *Jordan*.

*Jordan* involved a defendant who was functionally illiterate. The trial court initially allowed Jordan to proceed *pro se*, reasoning that his limited literacy "should not prevent him from representing himself." 831 F.3d at 842. The court reversed course, however, after it became clear that police reports and other written documents would be used at trial. *Id*. The court asked Jordan to read some of the documents aloud, which he did "with dismal results," then confirmed that he only "somewhat" understood them. *Id*. at 846. The court concluded that Jordan's limited literacy prevented him from presenting a meaningful defense on his own and insisted that he be represented at trial. *Id*. We disagreed with

the court's decision, seeing "no hint that the Supreme Court was talking about this vast population [of adults with no or limited literacy] in *Edwards*." *Id*. at 845. But because AEDPA "does not permit us to apply our own independent assessment" of the case, we felt compelled to deny relief, concluding that the state courts did not unreasonably consider Jordan's illiteracy to fall within the scope of "mental disability" the Court recognized as deserving special consideration. *Id*.

But the State does not argue that Washington's mental capacities fall on Jordan's side of the competency line, rather than on Imani's and Tatum's. Indeed, the State does not suggest that Washington suffers from any mental illness or disability, or that the state courts' denial of his right to self-representation rested on the belief that he did. Rather than seek to distinguish *Imani* and *Tatum* on these or any other facts, the State urges us to view those cases as "wrongly decided," reiterating its theory that there is no "clearly established" Supreme Court rule on point. But we remain convinced that those decisions—which have withstood a motion for rehearing en banc (denied in *Imani*) and a petition for a writ of certiorari (denied in *Tatum*, *Foster v. Tatum*, 138 S. Ct. 355 (Oct. 16, 2017))—arrive at the outcome mandated by the clear rules established in *Faretta* and its progeny.

The State's final argument is that the state appellate court's decision should be upheld because Washington's "obstructionist conduct" warranted the trial court's decision. In dueling letters filed pursuant to Fed. R. App. P. 28(j), the parties dispute the standard of review that applies to this argument in the wake of our decision in *Freeman v. Pierce*, 878 F.3d 580 (7th Cir. 2017), issued after the close of briefing in this case. In *Freeman*, we granted an Illinois state prison-

er's habeas petition after concluding that the state courts'
denial of his right to represent himself based on his limited
education and legal abilities was contrary to *Faretta*. *Id*. at
586. We also rejected the respondent's argument—raised for
the first time in its federal appellate brief—that the defend-
ant had acquiesced to representation by counsel and waived
his right to represent himself. *Id*. at 589–90. We observed that
"[w]hether a defendant waived his right to self-
representation through acquiescence is a question of fact,"
and that the Illinois Appellate Court did not make such a
factual finding. Accordingly, we reviewed the issue of ac-
quiescence/waiver *de novo*. *Id*. at 590.

Washington argues that because the Wisconsin Court of
Appeals did not rely on his putative "obstructionist miscon-
duct" to support the denial of his right to self-representation,
we consider the State's argument with no deference to the
state appellate court's decision. The State disputes the prem-
ise of Washington's argument, observing that the Wisconsin
Court of Appeals cited Washington's disruptive conduct as
among the factors supporting the trial court's denial of his
right to represent himself, although it viewed the issue
through the lens of competency. Indeed, after characterizing
Washington's behavior as "irrational and disruptive," the
Wisconsin Court of Appeals considered Washington's "fre-
quent disruptions in the courtroom, during which Washing-
ton interrupted and stalled proceedings, and in some in-
stances refused to participate in proceedings or even physi-
cally come to court."

It is true that the state appellate court did not frame
Washington's disruptive conduct as an independent reason
supporting the trial court's insistence upon counsel, but in-

stead viewed his conduct as supporting the court's competency determination. But we agree with the State that this distinction makes no difference in the AEDPA context, where "we review judgments, not opinions." *Rhodes v. Dittmann*, 783 F.3d 669, 675 (7th Cir. 2015). The hair-splitting Washington proposes finds no support in *Freeman,* where the respondent's newly minted argument rested on facts not determined by the state courts and presented a legal theory distinct from any the state courts had addressed.

What troubles us about the Wisconsin appellate court's conclusion that Washington's conduct justified the denial of his right to represent himself is another matter: The bulk of the conduct the court points to as "irrational and disruptive" (and nearly all of the conduct the State details in its brief) occurred *after* the trial court rejected Washington's request to proceed *pro se* and concerned his insistence that the court, the State, and his attorney were conspiring against him. As the Court observed in *Faretta*, "[t]o force a lawyer on a defendant can only lead him to believe that the law contrives against him." 422 U.S. at 834. Washington's conspiracy theory is almost certainly without substance—and his singular focus on it misguided—but it is not irrational. *See id*. The trial court would have been on solid constitutional ground had it allowed Washington to waive his right to counsel, then terminated his self-representation if it became clear that Washington was mentally unfit to conduct trial proceedings or that he sought to "use the courtroom for deliberate disruption" of his trial. *Id.* at 834 n. 46. What it could not do, consistently with *Faretta, Godinez*, and *Edwards*, was find him incompetent to waive his right to counsel and proceed to trial *pro se* based on its belief that he lacked the specialized knowledge required to confront the State's DNA evidence.

Nor could the Wisconsin Court of Appeals rehabilitate the trial court's constitutionally infirm decision by pointing to conduct that occurred after the decision was made. We conclude that the denial of Washington's right to represent himself was contrary to and an unreasonable application of Supreme Court precedent. That constitutional violation is not subject to harmless error analysis. *Imani*, 826 F.3d at 947.

The judgment of the district court is REVERSED and the case is REMANDED with instructions to grant the writ of habeas corpus, unless the State within 90 days of issuance of this court's mandate initiates steps to retry Washington.