In the

# United States Court of Appeals

## For the Seventh Circuit

No. 14-3343

ROBERT L. TATUM,

*Petitioner-Appellant,*

*v.*

BRIAN FOSTER,

*Respondent-Appellee.*

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 13-C-1348 — **Rudolph T. Randa**, *Judge.*

ARGUED SEPTEMBER 8, 2016 — DECIDED JANUARY 31, 2017

Before WOOD, *Chief Judge*, and KANNE and HAMILTON, *Circuit Judges*.

WOOD, *Chief Judge*. Although the Sixth Amendment to the U.S. Constitution gives every criminal defendant the right "to have the Assistance of Counsel for his defence," the Supreme Court has recognized for more than 40 years that this does not mean that counsel can be shoved down an unwilling defendant's throat. At least since the Court decided *Faretta v. California*, 422 U.S. 806 (1975), the constitutional language has been

understood as a personal right to decide how to defend one-self. "[T]he right to self-representation," *Faretta* proclaimed, "is thus necessarily implied by the structure of the Amendment." 422 U.S. at 819. This is true despite the fact that it is generally foolish for a person defending serious criminal charges to proceed without counsel. Trial judges are entitled—indeed encouraged—to warn defendants of the risks that attend self-representation. In the end, however, *Faretta* requires them to honor the defendant's wishes, assuming that the defendant is generally competent.

The present case raises the question whether the Wisconsin courts unreasonably applied *Faretta* when they refused to allow Robert Tatum to represent himself. The state trial court took this step after questioning Tatum not about his general competence, but about his educational level and understanding of the legal system. Tatum's conviction was upheld in the state court system, and the district court denied his petition for a writ of habeas corpus, filed pursuant to 28 U.S.C. § 2254. We reverse. Try as we might, we cannot reconcile the test the Wisconsin state courts used in assessing Tatum's right to self-representation with the Supreme Court's holding in *Faretta*.

## I

Tatum faced the most serious charges possible: two counts of first-degree intentional homicide by use of a dangerous weapon, stemming from the shooting deaths of two of his roommates, Kyle Ippoliti and Ruhim Abdella. The details of the crimes can be found in the decision of the Wisconsin Court of Appeals, *State v. Tatum*, 2013 WL 322647, No. 2011AP2439-CR (Wis. Ct. App. Jan. 29, 2013), whose findings of fact are presumed to be correct, 28 U.S.C. § 2254(e)(1). For present

purposes, however, the critical facts relate to the course of proceedings at trial.

After his arrest for the crimes, Tatum was arraigned. On July 20, 2010, represented by his first attorney, he demanded a speedy trial, and the case was set for a jury trial on November 29, 2010. On August 12, at Tatum's request, counsel moved to withdraw. The court granted the motion and vacated the speedy trial demand because Tatum wanted a new lawyer. His wish for a new attorney was granted. On September 23, the second lawyer filed a motion to suppress evidence based on the fact that Tatum's car had been searched, and evidence seized, without a warrant. Before the court was able to rule on the motion, Lawyer 2 moved to withdraw, on the ground that Tatum had shared confidential information with Tatum's mother, a material witness, and had thereby compromised the lawyer's position. Again the trial court granted the motion; the trial date remained November 29, 2010.

The court next appointed a third lawyer, Dianne Erickson, for Tatum. Erickson informed the court that she could not be prepared for a November 29 trial, and so the court reset the date for January 31, 2011. On January 18, Erickson requested a competence evaluation for Tatum. The next day the court held a hearing, at which it ordered that Tatum be evaluated by the Department of Health Services. Evidently this was done quickly; the parties returned to court on January 24 for the return of the evaluation. The report was inconclusive, because the examining psychologist was unable to form an opinion about Tatum's competence. The court then sent Tatum to a state mental-health facility for an inpatient evaluation. Ta-

tum protested mildly, saying that he would "rather just represent myself if [Erickson] finds that my competency is not up to her standards." The court responded with a "we'll see."

On February 24, inpatient evaluation in hand, the parties returned to court. Dr. Laurence Trueman, the examining professional, found that Tatum was competent enough to understand the proceedings and assist in his defense, but that Tatum was likely to be "an extremely challenging defendant." The state court described what happened next:

> At the same hearing, Tatum asked the trial court to dismiss Attorney Erickson, stating that she was working with the State and not investigating his case in accordance with his standards, forcing him (Tatum) to investigate his case on his own. Tatum also acknowledged that he refused to meet with Attorney Erickson out of frustration with counsel's competence challenge. The trial court asked Tatum whether he was requesting a new attorney or asking the trial court to allow him to represent himself. Tatum stated that he wished to represent himself. The trial court found Tatum competent to stand trial; however, after engaging in a colloquy with Tatum, denied his request to represent himself. The trial court stated that Tatum's limited education would make it difficult for him to understand the difficulties and disadvantages of self-representation. The trial court also refused to dismiss Attorney Erickson. The trial was then calendared for a jury trial on April 4, 2011.

We need to look in greater detail at the colloquy to which the state court referred. The critical part occurred at the conclusion of the February 24 hearing. Initially, the court said

"Okay. I think he's competent. I've got a report that says he is. I'm satisfied based on my colloquy that he is knowingly, voluntarily and intelligently giving up his right to a hearing. …" But the court made it clear that this was a finding that Tatum was competent to stand trial. It then went on to discuss Tatum's request to dismiss counsel:

> **The Court**: … Mr. Tatum, do you want a new lawyer or do you want to represent yourself?

> **Tatum**: I want to represent myself, Your Honor.

After further discussion, during which the judge expressed the concern that there was a total breakdown in communication between Tatum and Erickson, he returned to the topic of self-representation:

> **The Court**: I understand he wants to represent himself. What's your educational background, sir?

> **Tatum**: I'm self-educated. I went to public school up until the tenth grade after which time I attended home school and—

> **The Court**: Have you got a GED or HSED?

> **Tatum**: I would say I have the equivalent of an HSED.

> **The Court**: Do you have one?

> **Tatum**: No, sir.

> **The Court**: A formal one?

> **Tatum**: No, sir. I can easily obtain it. That hasn't been my main goal. My main goal when it comes down to getting paper to prove it, I mean that's less of a goal for me at least at this point in my life, but I've been

studying as far as the statutes, Wisconsin statute, studying representation for court proceedings. I have a good working knowledge of how court proceeding work.

**The Court**: Tell me about that. How does a trial work, sir?

**Tatum**: I mean, basically like I say, there's opening statements. You mean as far as proceedings before trial?

**The Court**: During trial.

**Tatum**: At the trial beginning?

**The Court**: Yeah.

**Tatum**: Basically opening statements.

**The Court**: What happens right before opening statements?

**Tatum**: I guess both parties states their appearance and things like that.

**The Court**: How do we get a jury?

**Tatum**: You do voir dire.

**The Court**: How does that work?

**Tatum**: You question—you question jurors, potential jurors—

**The Court**: About what?

**Tatum**: About various things.

**The Court**: What are we looking for in jurors?

> **Tatum**: Fair people who are giving a fair determination as far as hearing evidence, not making biased decisions, make decisions based on the evidence that's presented, not their own personal beliefs as far as, you know, bias and things like that.
>
> You have a certain amount of strikes, preemptory and strikes for cause. You got strikes for cause and if I had—I wasn't incarcerated at the facility where I had proper legal access I would be more prepared, I could prepare adequately. If I wasn't harassed in the jail I could prepare a lot better that way.

The judge asked Tatum how he would go about representing himself.

> **The Court:** What kind of difficulties would you imagine that you would have in self-representation?
>
> **Tatum:** You mean like my present circumstances?
>
> **The Court:** In your present circumstances.
>
> **Tatum:** Mainly the impairment based on the jail circumstances as far as them not providing me with reasonable access to the courts and legal materials.

Tatum and the judge then discussed how Tatum would go about investigating the case. Tatum said he would continue doing "what I've been doing all along," by making phone calls and gathering evidence. The colloquy then continued:

> **The Court**: What are you charged with, sir?
>
> **Tatum**: Two counts of first-degree intentional homicide.

**The Court**: What's the penalty—and two counts of what?

**Tatum**: Use of a dangerous weapon.

**The Court**: What's the penalty?

**Tatum**: Class A felonies carry the maximum of life in prison.

Finally, the court summarized the holding of *State v. Klessig*, 564 N.W.2d 716 (Wis. 1997), and concluded:

**The Court**: … He's made the choice, there's no question about it. He's aware of the seriousness of the charges. He's aware of the general range of penalties but he is not aware of the difficulties and disadvantages of self-representation especially given his circumstances, and given the fact that he's only got a tenth-grade education therefore I deny his right to represent himself.

Tatum protested this decision and continued to press his objection to Erickson. The court overruled him, ordered Erickson to serve as trial counsel, and proceeded to the trial. The jury found him guilty of both counts of first-degree homicide and he was sentenced to life in prison without the possibility of release.

In state post-conviction proceedings (which in Wisconsin can occur simultaneously with a direct appeal, see Wis. Stat. § 974.06; *Socha v. Pollard*, 621 F.3d 667, 668 (7th Cir. 2010)), Tatum once again filed a motion to represent himself on appeal. The appellate court permitted him to do so. On direct appeal, he raised three grounds for relief, including that he had been

denied his constitutional right to self-representation. The appellate court affirmed the trial court on all grounds. With respect to the self-representation claim, it ruled that Wisconsin law requires the use of a higher standard for self-representation than it does for competence to stand trial. The Wisconsin Supreme Court denied review.

Tatum then turned to the federal court and filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254. He included his *Faretta* claim as one of four grounds for relief, and the state conceded that he had exhausted and fairly presented this point. The district court rejected his argument on the merits, however, finding that the Wisconsin courts' approach to the right to self-representation did not violate law clearly established by the Supreme Court of the United States. This court granted Tatum's request for a certificate of appealability, limited to the self-representation issue.

## II

Our consideration of this case is governed by the standards of the Antiterrorism and Effective Death Penalty Act (AEDPA), under which a federal court may issue the writ of habeas corpus only if the state court's decision is "contrary to, or involves an unreasonable application of, clearly established Federal law," 28 U.S.C. § 2254(d)(1), or if it "was based on an unreasonable determination of the facts in light of the evidence," *id.* § 2254(d)(2). A decision is "contrary to" established precedent "if it applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases, or if it confronts a set of facts that is materially indistinguishable from a decision of [the Supreme Court] but reaches a different result." *Brown v. Payton*, 544 U.S. 133, 141 (2005). A state court's decision "involves an unreasonable application of [the Supreme

Court's] clearly established precedents if the state court applies [the Supreme Court's] precedents to the facts in an objectively unreasonable manner." *Id.* This creates a high bar. The state court decision cannot be merely wrong; it must be so unreasonable that there is no possibility that "fairminded jurists could disagree on the correctness" (or lack thereof) of the decision. *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (internal quotations omitted). We turn to Tatum's arguments with this demanding standard in mind.

*Faretta* established the basic principle that is at issue in this case. Acknowledging that the question was not an easy one, the Supreme Court held in 1975 that a state may not constitutionally "hale a person into its criminal courts and there force a lawyer upon him, even when he insists that he wants to conduct his own defense." 422 U.S. at 807. The Court also addressed the question before us: what does it take for a waiver of counsel to be effective? This is what it had to say:

> When an accused manages his own defense, he relinquishes, as a purely factual matter, many of the traditional benefits associated with the right to counsel. For this reason, in order to represent himself, the accused must knowingly and intelligently forgo those relinquished benefits. Although a defendant need not himself have the skill and experience of a lawyer in order competently and intelligently to choose self-representation, he should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that he knows what he is doing and his choice is made with eyes open.

*Id*. at 835 (internal citations and quotation marks omitted). It went on to hold that Faretta had "clearly and unequivocally

declared … that he wanted to represent himself and did not want counsel." *Id*. Moreover, "[t]he record affirmatively show[ed] that Faretta was literate, competent, and understanding, and that he was voluntarily exercising his informed free will." *Id*. The Court found no need to assess "how well or poorly Faretta had mastered the intricacies of the hearsay rule and the California code provisions that govern challenges of potential jurors on voir dire," because "his technical legal knowledge, as such, *was not relevant to an assessment of his knowing exercise of the right to defend himself.*" *Id*. at 836 (emphasis added).

The Court returned to the problem of self-representation in *Godinez v. Moran*, 509 U.S. 389 (1993). The question there was "whether the competency standard for pleading guilty or waiving the right to counsel is higher than the competency standard for standing trial." 509 U.S. at 391. The Court answered with a flat "no." Its opinion shows that the critical question relates to the defendant's mental functioning, not to any particular knowledge he may have:

> Nor do we think that a defendant who waives his right to the assistance of counsel must be more competent than a defendant who does not, since there is no reason to believe that the decision to waive counsel requires an appreciably higher level of mental functioning than the decision to waive other constitutional rights. Respondent suggests that a higher competency standard is necessary because a defendant who represents himself must have greater powers of comprehension, judgment, and reason than would be necessary to stand trial with the aid of an attorney. … But this argu-

> ment has a flawed premise; the competence that is re-
> quired of a defendant seeking to waive his right to
> counsel is the competence to *waive the right*, not the
> competence to represent himself.

*Id*. at 399 (internal quotation marks and citations omitted). The Court wrapped up its opinion by reaffirming that the trial court must always satisfy itself that the waiver is knowing and voluntary. Only in this sense, it said, was more needed to waive the right to counsel than is necessary for a finding of basic competence to stand trial. See *Westbrook v. Arizona*, 384 U.S. 150 (1966).

In *Iowa v. Tovar*, 541 U.S. 77 (2004), the Court reiterated that the critical point that must be established is that the waiver of the right to counsel is the product of a "knowing, intelligent act done with sufficient awareness of the relevant circumstances." *Id.* at 80 (internal quotation marks and alterations omitted). But *Tovar* holds that the Sixth Amendment does not compel a trial court specifically to warn a defendant about the substantive consequences of his waiver, including the risk that a potential defense might be overlooked and the loss of the chance to obtain an attorney's independent opinion on the wisdom of a guilty plea. *Id.* at 81.

The state courts thought that *Indiana v. Edwards*, 554 U.S. 164 (2008), introduced the possibility of taking into account the defendant's legal knowledge, but that is not what the case holds. In *Edwards*, the Court faced the problem of "a criminal defendant whom a state court found mentally competent to stand trial if represented by counsel but not mentally competent to conduct that trial himself." *Id.* at 167. In that situation, it held, the state may insist that the defendant proceed to trial with counsel.

Mental competence, or mental functioning (as *Faretta* called it), the Court said, presents a distinct problem for self-representation. It acknowledged that *Godinez* had rejected the idea of a two-tier standard for competence in the circumstances presented there. "To put the matter more specifically, the *Godinez* defendant sought only to change his pleas to guilty, he did not seek to conduct trial proceedings, and his ability to conduct a defense at trial was expressly not at issue." *Id.* at 173. In addition, *Godinez* "involved a State that sought to *permit* a gray-area defendant to represent himself"—a decision the Court held was permissible. *Id.*

With respect to the case before it, the Court began by "assum[ing] that a criminal defendant has sufficient mental competence to stand trial … and that the defendant insists on representing himself during that trial. We ask whether the Constitution permits a State to limit that defendant's self-representation right by insisting upon representation by counsel at trial—on the ground that the defendant lacks the mental capacity to conduct his trial defense unless represented." *Id.* at 174. It answered that question affirmatively, stressing throughout its explanation that it was focusing on mental *competence*. Some people, states may conclude, are competent enough to stand trial with the assistance of counsel, but lack sufficient competence to conduct their own defense. One example the Court gave of such a person was someone suffering from mental derangement serious enough to deprive the person of a fair trial if he were to conduct his own defense. *Id.* at 175. It concluded with this statement: "[T]he Constitution permits States to insist upon representation by counsel for those competent enough to stand trial under *Dusky [v. United States*, 362 U.S. 402 (1960)]* but who still suffer from severe mental

illness to the point where they are not competent to conduct trial proceedings by themselves." *Id.* at 178.

Throughout the opinion, the emphasis is on competence, not on particular skill. The Court declined to accept Indiana's invitation to adopt a more specific standard under which a defendant would not have the right to self-representation if he could not communicate coherently with the court or a jury. *Id.* It also rejected Indiana's request to overrule *Faretta. Id.*

Rather than focusing on this line of U.S. Supreme Court decisions, the Wisconsin courts in Tatum's case relied on the state supreme court's decision in *State v. Klessig, supra* at 8, for guidance. *Klessig* announced that "[j]ust as the right to the assistance of counsel is identical under the Wisconsin and United States Constitutions, the right to represent oneself also does not differ." 564 N.W.2d at 720. As a matter of state-court administration, it established a mandatory colloquy for cases in which the defendant wants to waive counsel:

> To prove such a valid waiver of counsel, the circuit court must conduct a colloquy designed to ensure that the defendant: (1) made a deliberate choice to proceed without counsel, (2) was aware of the difficulties and disadvantages of self-representation, (3) was aware of the seriousness of the charge or charges against him, and (4) was aware of the general range of penalties that could have been imposed on him. … If the circuit court fails to conduct such a colloquy, a reviewing court may not find, based on the record, that there was a valid waiver of counsel.

*Id.* at 206 (internal citation omitted). It then discussed the standards for competence to stand trial and, citing *Godinez*,

distinguished this from competence to represent oneself. *Id.* at 208–09.

Although we have some question about the fourth item on the *Klessig* list, which seems to address detailed knowledge rather than competence, the greater problem is that the state court, applying *Klessig*, strayed from the "mental functioning" sense of competence over to educational achievement and familiarity with the criminal justice system. As the Wisconsin Supreme Court put it, "[i]n making a determination on a defendant's competency to represent himself, the circuit court should consider factors such as the defendant's education, literacy, fluency in English, and any physical or psychological disability which may significantly affect his ability to communicate a possible defense to the jury." *Id.* at 212 (internal quotation marks omitted). It is a short step from those factors to the state trial judge's concern about the level of education Tatum had achieved (tenth grade) and his apparent lack of awareness of the difficulties of self-representation.

This is the third time in recent months that we have had to consider a habeas corpus petition based on *Faretta* and the application of Wisconsin's *Klessig* decision. Although this court's decisions are not authoritative for purposes of AEDPA, they can present useful examples. In that spirit, we find the decision in *Imani v. Pollard*, 826 F.3d 939 (7th Cir. 2016), helpful, as *Imani* also involved the compatibility of Wisconsin's *Klessig* approach with the decisions of the U.S. Supreme Court. In *Imani*, the petitioner tried to exercise his right to self-representation in a Wisconsin trial court, but the judge prevented him from doing so. The judge dismissed as irrelevant and unconvincing Imani's statement that he had been working on the case for 13 months. Instead, after learning that Imani had a

tenth-grade education, that he read at a college level, and that he had appeared in at least five prior criminal cases, the judge announced that Imani did not have a "sufficiently rational basis" to justify self-representation. *Id.* at 942. The Wisconsin Supreme Court found that the trial court's determination that Imani was not competent to proceed pro se was supported by the record, despite the absence of any evidence of mental illness or disability.

We reversed, finding that the state supreme court's decision "was flatly contrary to *Faretta* and its progeny in three distinct ways." *Id.* at 943. The first two dealt with burdens of proof, but the third is directly relevant here: "the state court imposed a competence standard much more demanding than *Faretta* and its progeny allow, as if the issue were whether Imani was an experienced criminal defense lawyer." *Id.* at 944. We continued with the observation that "Imani's education and communication abilities are materially indistinguishable from those in *Faretta*, and the Wisconsin courts identified no mental illness or impairment that might have rendered Imani incompetent as allowed by *Indiana v. Edwards* … ." *Id.*

The same problem arose in Tatum's case. Nothing in the colloquy, most of which we have reproduced above, suggests that Tatum suffered from deficient mental functioning, as opposed to a limited education. In fact, he displayed relatively good knowledge of the criminal process: he gave a reasonable description of voir dire (which he correctly called by name), strikes for cause and peremptory strikes, opening statements, the nature of the charges against him, and the general range of penalties he faced. *Faretta* requires no more. The court's failure to recognize this was compounded when it inappropri-

ately placed the burden on Tatum to convince it that he understood, and accepted, the challenges of self-representation. This, too, was inconsistent with *Faretta*, which places the duty on the trial court to warn the defendant about what he is getting into, and then leave the defendant free to decide how he wants to proceed. *Faretta*, 422 U.S. at 834 (the right to defend is personal, and so "[i]t is the defendant … who must be free personally to decide whether in his particular case counsel is to his advantage"); see also *Imani*, 826 F.3d at 944.

*Jordan v. Hepp*, 831 F.3d 837 (7th Cir. 2016), which raised a similar self-representation argument, provides a useful contrast to this case. The defendant, Jordan, was charged with reckless homicide and related charges that stemmed from a shooting death. *Id*. at 841. The Wisconsin court denied Jordan's request to represent himself because Jordan was nearly illiterate and had limited education. The court believed Jordan's education would prevent him from making a meaningful defense because he would be unable to use written documents including police reports and a signed confession. *Id*. at 842.

In denying Jordan's petition for a writ of habeas corpus, we recognized that the Supreme Court has not precluded state courts altogether from inquiring about a defendant's ability to represent himself. *Id*. at 844 (citing *Godinez* and *Edwards*). We observed that "the Wisconsin court came close to making an unreasonable application of the *Faretta* line of cases," but we concluded that the state court's decision did not stray so far from Supreme Court precedent to warrant issuance of the writ. *Id*. at 843, 845.

It was possible in *Jordan* to view the state court's inquiry as one into the defendant's mental functioning, as permitted

by the *Faretta* line of cases. By contrast, nothing cast doubt on Tatum's competence in this sense of the term. Tatum's education was not so limited that he would have been unable to defend himself. He told the judge that he attended public school until the tenth grade, after which he attended home school. He had been able to study court procedures and the Wisconsin statutes. That was enough. We note parenthetically that requiring defendants to have a high school diploma or its equivalent would preclude a great number of people from representing themselves and leave little left of *Faretta*. One recent study of adults in state and federal prisons estimated that some 30 percent of prisoners lack high school credentials. U.S. DEP'T OF EDUC., NAT'L CENTER FOR EDUC. STATISTICS, NCES 2016-040, U.S. PROGRAM FOR THE INT'L ASSESSMENT OF ADULT COMPETENCIES, U.S. NAT'L SUPPLEMENT: PRISON STUDY 2014, Table 1.1, https://nces.ed.gov/pubs2016/2016040.pdf.

We conclude that the way in which the Wisconsin courts implemented their *Klessig* test here was inconsistent with *Faretta*'s prohibition against resting the determination about the knowing and intelligent nature of the defendant's choice on his "technical legal knowledge." *Faretta*, 422 U.S. at 835–36. This is apparent both from the state trial judge's comments and from the Wisconsin appellate court's concern that Tatum's statements in court "reflect his limited understanding of the scope of a proper investigation for the defense of homicide charges" and its comment that he failed to appreciate "courtroom decorum and legal technicalities."

None of this is to say that Tatum was making a wise choice when he tried so hard to win his right to self-representation. *Faretta* recognizes that "[i]t is undeniable that in most criminal prosecutions defendants could better defend with counsel's

guidance than by their own unskilled efforts." *Id.* at 834. But *Faretta* protects the right of a criminal defendant to make this (usually) self-defeating choice. By failing to recognize that the Supreme Court's *Faretta* line of cases focus only on competence as it relates to mental functioning, and forbids the consideration of competence in the sense of accomplishment, the Wisconsin courts reached a result that is contrary to, as well as an unreasonable application of, the Supreme Court's rulings.

## III

The judgment of the district court is REVERSED and the case is REMANDED for issuance of the writ of habeas corpus, unless the state within 90 days of issuance of this court's mandate initiates steps to give Tatum a new trial.