# COURT OF APPEALS
# DECISION
# DATED AND FILED

## January 26, 2021

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

**This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.**

**A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals.** *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2019AP1016-CR**

STATE OF WISCONSIN

Cir. Ct. No. **2010CF2660**

IN COURT OF APPEALS
DISTRICT I

---

STATE OF WISCONSIN,

    PLAINTIFF-RESPONDENT,

  V.

ROBERT L. TATUM,

    DEFENDANT-APPELLANT.

---

APPEAL from a judgment of the circuit court for Milwaukee County: MARK A. SANDERS, Judge. *Affirmed*.

Before Brash, P.J., Dugan and White, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1      PER CURIAM.   Robert L. Tatum, *pro se*, appeals a judgment entered in May 2018, after a jury found him guilty of two counts of first-degree intentional homicide by use of a dangerous weapon.  The trial was his second for these crimes. He contends that he suffered violations of his rights to a speedy trial and to present a defense.  We reject his contentions and affirm.

## BACKGROUND

¶2      The litigation that preceded this appeal encompassed Tatum's trial in 2011, postconviction litigation in both state and federal courts from 2011 through 2017, and Tatum's retrial in 2018.  The issues that Tatum raises require that we describe portions of that litigation and the underlying facts in some detail.

¶3      On May 22, 2010, the bodies of two of Tatum's former housemates, Kyle Ippoliti and Ruhim Abdella, were found shot through the head in their home. On May 27, 2010, the State charged Tatum with two counts of first-degree intentional homicide by use of a dangerous weapon.  Tatum, represented by counsel, proceeded to trial on April 4, 2011.  On April 7, 2011, a jury found him guilty as charged.

¶4      Tatum subsequently discharged his appointed appellate counsel and pursued a direct appeal *pro se*.  We affirmed, concluding that he did not suffer a violation of his statutory right to a speedy trial or a violation of his constitutional right to represent himself at trial.  *See* ***State v. Tatum*** (***Tatum I***), No. 2011AP2439-CR, unpublished slip op. (WI App. Jan. 29, 2013).  The supreme court denied his petition for review.  *See* ***State v. Tatum*** (***Tatum II***), No. 2011AP2439-CR, unpublished order (WI Aug. 1, 2013).

¶5 Tatum next petitioned the federal district court for a writ of habeas corpus. The district court denied the petition. The district court rejected Tatum's claim that he was unconstitutionally denied the right to represent himself at trial, concluding that the Wisconsin trial court correctly applied Wisconsin law and that Wisconsin's "approach ... does not violate clearly established federal law." *Tatum v. Meisner* (*Tatum III*), No. 13-C-1348, 2014WL4748901, at *1 (E.D. Wis. Sept. 24, 2014), *rev'd sub nom.* *Tatum v. Foster* (*Tatum IV*), 847 F.3d 459 (7th Cir. 2017). The district court also rejected Tatum's claim that he suffered a violation of the statutory right to a speedy trial, explaining that such a claim is not cognizable in federal court but adding that if Tatum had instead pursued a constitutional claim, it would likely have failed because "much of the delay was caused by Tatum's own intransigence." *Id.* The district court further rejected Tatum's claim that his trial counsel was ineffective, holding both that Tatum failed to preserve the claim by raising it first in state court and that the claim was frivolous. *See id.* at *2. The district court similarly concluded that Tatum had failed to preserve his claim that he was denied his constitutional right to an impartial decision-maker and added that this claim too was frivolous, explaining that the substance of this claim was that "because the state courts ruled against [Tatum], it follows that they were constitutionally unfair and biased against [him]." *See id.* The district court then denied Tatum a certificate of appealability on the ground that "Tatum failed to make a 'substantial showing' that 'jurists of reason could disagree with the district court's resolution of his constitutional claims.'"[1] *See id.* (citation omitted).

---

[1] Pursuant to FED. R. APP. P. 22(b)(1), "[i]n a habeas corpus proceeding in which the detention complained of arises from process issued by a state court ... the applicant cannot take an appeal unless a circuit justice or circuit or district judge issues a certificate of appealability under 28 U.S.C. 2253(c)."

¶6      The Seventh Circuit subsequently granted Tatum a certificate of appealability limited to the question of his right to self-representation, and he pursued his challenge in that court with the assistance of appointed counsel. On January 31, 2017, the Seventh Circuit released an opinion agreeing with Tatum that the Wisconsin trial court had denied him his constitutional right to represent himself. *See Tatum IV*, 847 F.3d 468-69. Ten days later, Tatum moved for a rehearing, which the Seventh Circuit denied on March 1, 2017.[2]  On March 9, 2017, the Seventh Circuit entered its mandate remanding the matter to the district court with orders to issue a writ of habeas corpus unless Wisconsin took steps within ninety days to retry Tatum.

¶7      By order of May 22, 2017, on motion of the State, the Seventh Circuit recalled and stayed its mandate pending the State's petition for a writ of certiorari in the United States Supreme Court.[3]  On May 30, 2017, the State filed its petition. The Supreme Court denied the petition on October 16, 2017, and the Seventh Circuit duly reissued its mandate the next day. On October 25, 2017, the Wisconsin trial court scheduled a hearing in the instant matter, thereby initiating steps to retry Tatum. At the November 13, 2017 hearing, the trial court vacated Tatum's 2011 homicide convictions and entered his demand for a speedy trial. The matter was set for a jury trial in January 2018.

---

[2] We take judicial notice of the federal docket for *Tatum v. Foster* (*Tatum IV*), 847 F.3d 459 (7th Cir. 2017), which is included in the respondent's appendix. *See State v. Martinez*, 2007 WI App 225, ¶2 & n.2, 305 Wis. 2d 753, 741 N.W.2d 280.

[3] Although the named respondents to Tatum's federal habeas corpus litigation were the wardens of the institutions where Tatum was confined, we refer to the respondents as the State in our discussion of the litigation. *See State ex rel. Lopez-Quintero v. Dittmann*, 2019 WI 58, ¶16 n.7, 387 Wis. 2d 50, 928 N.W.2d 480.

4

¶8 Shortly after the November 13, 2017 hearing, Tatum filed a proposed witness list that included the judge who presided at his 2011 trial, the assistant district attorney who handled the prosecution in that trial, and the court reporters who transcribed the proceedings. Tatum indicated that these witnesses would allow him to prove that State actors fabricated evidence against him and then took steps to silence him, to tamper with the trial transcripts, and to hamper his efforts at vindication by appeal. The State moved to exclude those witnesses as well as several others that Tatum wished to call, including a detective involved in investigating the case and a psychologist who examined Tatum in custody. As grounds, the State alleged that none of these witnesses had relevant information about whether Tatum caused the deaths of Ippoliti and Abdella and that each witness's testimony was therefore irrelevant.

¶9 During the hearing on the State's motion, the State abandoned its challenge to testimony from a detective that Tatum proposed to call. The circuit court then considered whether to permit Tatum to present testimony from the psychologist that Tatum said would testify about allegedly inaccurate entries in the records maintained by the Department of Corrections. According to Tatum, the entries reflected the State's efforts to portray him falsely as mentally ill in order to impede his appeal from the original convictions and prevent him from demonstrating his ability to represent himself. The circuit court cautioned that the evidence was of only minimal relevance but ultimately denied the State's motion to bar the psychologist's testimony.

¶10 The circuit court granted the State's motion to bar testimony from the judge who presided at Tatum's first homicide trial, the assistant district attorney who conducted the prosecution, and the court reporters who transcribed the testimony. The circuit court concluded that Tatum failed to show either that these

witnesses would give the testimony he hoped to elicit or that they had relevant evidence to offer.

¶11    Tatum's retrial began on January 29, 2018.  Tatum represented himself with the assistance of standby counsel.  The evidence presented by the State included testimony from  Sylvester Hollins and Daniella Belongia, who said that on May 22, 2010, they lived in a house that they shared with several other people, including Ippoliti—the homeowner—and Abdella.  Tatum had also lived with the group at one time but had been asked to move out because he was not paying rent.  He was nonetheless at the house on the evening of May 22, 2010.  At approximately 7:00 p.m., as Hollins and Belongia prepared to go out for the evening, they asked Tatum to move his car, which was blocking theirs.  They testified that he complied, and as they drove away, they did not see Tatum drive after them.

¶12    Additional evidence showed that another roommate returned to the Ippoliti household at about 10:00 p.m. that same night, discovered the bodies of Ippoliti and Abdella, and called the police.  A detective described responding to the call, arriving at the house, and observing two dead bodies.  Abdella's eighteen-month-old child was the only other person in the home.

¶13    Detective Daniel Goldberg testified on direct examination about shotgun shells that he found at the crime scene.  In response to Tatum's cross-examination, Goldberg testified that he vaguely recalled interviewing an inmate named Jeffrey McCord.  Tatum then sought to confront Goldberg with a recording that, according to Tatum, revealed that Goldberg showed something to McCord during the custodial interview to assist him in fabricating evidence against Tatum.  After the State objected that Tatum was misrepresenting the facts, the circuit court and the parties listened to the recording outside the presence of the jury.  Tatum

conceded that the recording revealed that a person other than the two detectives conducting the interview had showed McCord a document relating to Tatum's case. The circuit court found that the person was McCord's own attorney and disallowed the recording as evidence.

¶14    Tatum's brother, Dwight Tatum, testified that he did not recall a statement that he gave to police a few days after the homicides.[4]  The State then played a recording of Dwight's statement in which he said that soon after the homicides he spoke to Tatum, who said that he "did it," and that "God told him to do it."  Tatum also told Dwight that the Quran mandates "kill[ing] your open enemies," and that Ippoliti and Abdella were Tatum's open enemies.  Another of Tatum's brothers, Warren Nelson, described how he and Tatum's father spoke to Tatum, and Tatum admitted shooting Ippoliti with "a shotgun blast to the head." Tatum also admitted shooting Abdella after he "put his hand up."  According to Nelson, Tatum said that "a force told him to do it."

¶15    Alfonzo Treadwell testified that he spoke to Tatum while both men were in jail.  According to Treadwell, he was playing chess with another inmate, Jesse White, when Tatum approached, drew Treadwell aside, and admitted committing two homicides by shooting the victims with a shotgun.[5]

¶16    After the State rested, Tatum testified in his own defense.  He said that on the afternoon of the homicides, he watched a movie with Ippoliti and Abdella at

---

[4]  For ease of reading and to avoid confusion, we refer to Dwight Tatum as Dwight in the remainder of this opinion.

[5]  The State presented additional evidence, including testimony about items found during a search of Tatum's car.  That testimony is not relevant to the issues that Tatum raises on appeal.

Ippoliti's house. Tatum said that he moved his truck when asked to do so and that he did not subsequently return to Ippoliti's house but instead drove to his mother's home, where he watched a movie with his brother Eris Tatum and spent the night.[6]

¶17    Tatum additionally told the jury that the State had fabricated evidence against him. Specifically, he said that while he was in jail, he heard that other inmates were claiming that he had conversations with them about his case. Tatum testified that he had not had such conversations and that "persons ... were just making up these statements and getting information regarding the case somehow and attributing it to [Tatum]." He told the jury that this was a routine practice, and that police use inmate statements "to shore up a case." He added that if the police have "sufficient evidence, they're not going to rely on a jailhouse snitch [who] most of the time they know [is] lying."

¶18    Tatum called Detective James Hensley to testify about his interviews with inmates Treadwell and White. Tatum highlighted anomalies in the inmates' statements and asked Hensley if he had helped the inmates fabricate the statements. Hensley denied doing so.

¶19    Tatum recalled Goldberg to the stand and questioned him about the protocol for documenting an informant's statement. On cross-examination by the State, Goldberg testified that he interviewed Tatum after the homicides, and Tatum did not say that he watched a movie with his brother Eris Tatum on the night of May 22, 2010, nor did Tatum say that he slept at his mother's home that night. Rather, Tatum said that he spent the night of the homicides in a vacant house.

---

[6] Tatum presented testimony from Eris Tatum in support of an alibi defense. The specifics of Eris Tatum's testimony are not relevant to the issues that Tatum raises on appeal.

¶20     Tatum called Detective James Hutchinson to testify about his investigation of Tatum's alibi defense.  Tatum suggested that one of Hutchinson's investigative reports supported Tatum's claim that on May 22, 2010, Tatum was inside his mother's home from 6:45 p.m. until 11:48 p.m., and that Hutchinson was misrepresenting the results of his investigation.  Hutchinson responded that, as reflected in his report, an examination of Tatum's cellphone records showed that Tatum's cell phone was used twice during the target time frame to place calls to a "phone number which was within the residence" of Tatum's mother.  Hutchinson testified that he "found it unusual" that Tatum would call a residence at the same time that he claimed to be inside that residence.

¶21     Finally, Tatum presented testimony from White.  White admitted that he had testified against Tatum in a previous proceeding, and White also admitted that he had acted as an informant in two other cases.  White went on to testify that he did not recall any of the testimony he previously gave against Tatum or the source of that information.[7]  White denied, however, that the police gave him information to assist him in fabricating testimony.

¶22     The jury found Tatum guilty as charged.  He appeals, alleging violations of his constitutional and statutory rights to a speedy trial and a violation of his constitutional right to present a defense.

**DISCUSSION**

¶23     Tatum first claims that he was denied his constitutional right to a speedy trial. The Sixth Amendment to the United States Constitution and article I,

---

[7] In response to White's insistence that he did not remember his prior testimony, Tatum asked White directly whether he remembered "telling police that Tatum [said], 'I had to shoot them two white motherf*ers.'"  White answered that he did not recall.

9

section 7 of the Wisconsin Constitution guarantee the right to a speedy trial in criminal prosecutions. Wisconsin courts assess whether a criminal defendant suffered a violation of the constitutional right to a speedy trial by conducting the four-factor test set forth in *Barker v. Wingo*, 407 U.S. 514, 530 (1972). *See Day v. State*, 61 Wis. 2d 236, 244, 212 N.W.2d 489 (1973) (adopting the *Barker* test). Our review is *de novo*. *See State v. Urdahl*, 2005 WI App 191, ¶10, 286 Wis. 2d 476, 704 N.W.2d 324.

¶24 The first *Barker* factor is the length of the delay. *See id.*, 407 U.S. at 530. This factor is a "triggering mechanism." *See State v. Borhegyi*, 222 Wis. 2d 506, 510, 588 N.W.2d 89 (Ct. App. 1998). Only if the length of the delay is presumptively prejudicial must we consider the other *Barker* factors. *See Borhegyi*, 222 Wis. 2d at 510. Generally, a delay that approaches one year is presumptively prejudicial. *See id.* The second *Barker* factor is the reason for the delay. *See id.*, 407 U.S. at 530. When assessing this factor, a court identifies the reason for each particular portion of the delay and considers only delays attributable to the State. *See Norwood v. State*, 74 Wis. 2d 343, 354, 246 N.W.2d 801 (1976). Courts do not count delays caused by the defendant, nor do courts count delays that are intrinsic to the case. *See Urdahl*, 286 Wis. 2d 476, ¶26. The third *Barker* factor is whether the defendant asserted the right to a speedy trial, and the fourth is whether the defendant suffered prejudice from the delay. *See id.*, 407 U.S. at 530.

¶25 Because Tatum must satisfy the first *Barker* factor to proceed to the remaining three, we begin by considering the length of the delay. Tatum asserts that it is nearly eight years long, measured from the time that he was charged with homicide on May 27, 2010, until the day that his retrial began on January 29, 2018. Tatum, however, incorrectly calculates the applicable time period.

¶26 First, any delay that preceded Tatum's first trial in 2011 is irrelevant to the speedy trial analysis here. In ***Betterman v. Montana***, 136 S. Ct. 1609, 1612 (2016), the Supreme Court held that the Sixth Amendment right to a speedy trial "protects the accused from arrest or indictment through trial, but does not apply once a defendant has been found guilty at trial." In other words, the right to a speedy trial "detaches upon conviction." ***Id.*** at 1613. Accordingly, because Tatum's right to a speedy trial detached upon his original conviction, we do not consider the time between his arrest and his first trial in assessing the delay in starting his second trial.[8] *See **id.**; see also **Wilson v. MacLaren***, 2:18-CV-11243, 2019WL1002609, at *4-5 (E.D. Mich. Mar. 1, 2019) (addressing a speedy trial claim following a retrial and excluding consideration of any delay before the defendant's first trial, explaining that, pursuant to ***Betterman***, "[t]he speedy trial guarantee ... does not apply once a defendant has been found guilty").[9]

¶27 Second, the time periods that Tatum spent pursuing an appeal of his convictions in state courts and pursuing a writ of habeas corpus in the federal courts are also inapplicable to the speedy trial analysis. These time periods followed the date of his original convictions and thus occurred after his right to a speedy trial

---

[8] Were we to conclude that the time that Tatum spent awaiting his first trial was relevant to his current speedy trial claim, we would nonetheless decline to include that time in calculating the length of the delay. As we explained when resolving Tatum's first appeal, Tatum was responsible for a substantial portion of the delay, and none of the delay was the State's fault. *See **State v. Tatum** (**Tatum I***), No. 2011AP2439-CR, unpublished slip op. ¶¶17-18 (WI App Jan. 29, 2013). The federal district court reached a similar conclusion, observing that the delay was largely the result of Tatum's "intransigence." *See **Tatum v. Meisner** (**Tatum III***), No. 13-C-1348, 2014WL4748901, at *1 (E.D. Wis. Sept. 24, 2014), *rev'd on other grounds sub nom. **Tatum v. Foster** (**Tatum IV***), 847 F.3d 459 (7th Cir. 2017). Accordingly, the ten months and eight days between May 27, 2010, when Tatum was charged, and April 4, 2011, when his first trial began, would not be counted in the speedy trial analysis even if that time was relevant. *See **State v. Urdahl***, 2005 WI App 191, ¶26, 286 Wis. 2d 476, 704 N.W.2d 324.

[9] We cite ***Wilson v. MacLaren***, 2:18-CV-11243, 2019WL1002609 (E.D. Mich. Mar. 1, 2019) for its persuasive value. *Cf.* WIS. STAT. RULE 809.23(3)(a) (2017-18); FED.R.APP.P. 32.1. All references to the Wisconsin Statutes are to the 2017-18 version unless otherwise noted.

detached. "Adverse consequences of postconviction delay ... [fall] outside the purview of the Speedy Trial Clause." **Betterman**, 136 S. Ct. at 1615.

¶28 Tatum rejects this conclusion. He argues that the delay occasioned by a defendant's appeal is relevant to the speedy trial analysis and directs our attention to **United States v. Loud Hawk**, 474 U.S. 302 (1986), but his reliance on **Loud Hawk** is misplaced. **Loud Hawk** addressed delay "occasioned by an interlocutory appeal when the defendant is subject to indictment or restraint." **Id.** at 312. The Court concluded that such delay might conflict with a defendant's interest in a speedy trial and therefore must be analyzed under **Barker**. *See* **Loud Hawk**, 474 U.S. at 312-13.[10] The defendants' appeals in **Loud Hawk**, however, preceded any conviction, and the delay thus occurred while the right to a speedy trial remained attached. *See* **Betterman**, 136 S. Ct. at 1613. Such is not the case with the postconviction appeals and collateral attacks that delayed Tatum's retrial here. **Loud Hawk** therefore does not support Tatum's claims that the time he spent attacking his convictions is relevant to the speedy trial analysis.

¶29 The Supreme Court in **Betterman** expressly did not decide whether the right to a speedy trial "reattaches upon renewed prosecution following a defendant's successful appeal, when he again enjoys the presumption of innocence." *See* **id.**, 136 S. Ct. at 1613 n.2. We assume without deciding that the right does reattach at that point. However, we reject Tatum's suggestion that he again enjoyed the presumption of innocence as of January 31, 2017, the date on which the Seventh Circuit released its decision in **Tatum IV**.

---

[10] The Supreme Court in **United States v. Loud Hawk**, 474 U.S. 302, 308-12 (1986), also considered periods of delay following dismissal of criminal charges and concluded that those periods did not raise concerns under the Sixth Amendment's Speedy Trial Clause.

¶30    The Seventh Circuit did not reverse or vacate Tatum's criminal convictions. Rather, the Seventh Circuit ordered "issuance of the writ of habeas corpus, unless the [S]tate, within 90 days of issuance of [the Seventh Circuit's] mandate initiates steps to give Tatum a new trial." *Id.*, 847 F.3d at 469.[11] Thus, the Seventh Circuit's January 31, 2017 opinion did not reinstate the presumption of innocence that Tatum enjoyed before his convictions and, accordingly, did not reinstate Tatum's constitutional speedy trial rights. *Cf. Betterman*, 136 S. Ct. at 1613 n.2. Rather, it was the Wisconsin trial court that reinstated the presumption of Tatum's innocence when that court vacated his convictions on November 13, 2017. Tatum's trial began seventy-seven days later, a time period far too short to give rise to the presumption of prejudice necessary to trigger the remaining **Barker** factors. *See **Borhegyi***, 222 Wis. 2d at 510.

¶31    Moreover, were we to equate the conditional issuance of a writ of habeas corpus on January 31, 2017, with reversal of a conviction—and we do not—we would nonetheless conclude that Tatum did not suffer a violation of his right to a speedy trial. The period between the Seventh Circuit's decision on January 31, 2017, and the start of Tatum's trial on January 29, 2018, is less than one year and thus does not clearly cross the threshold necessary to give rise to a presumption of prejudice. *See id.* For the sake of completeness, however, we assess the extent to which that 363-day period is attributable to the State for purposes of the speedy trial analysis. *See **Norwood***, 74 Wis. 2d at 354.

---

[11] The relief Tatum received from the Seventh Circuit is typical of that granted in federal habeas corpus litigation. *See **Herrera v. Collins***, 506 U.S. 390, 403 (1993) ("The typical relief granted in federal habeas corpus is a conditional order of release unless the State elects to retry the successful habeas petitioner.").

¶32    Following release of the Seventh Circuit's opinion, the parties had fourteen days to petition for rehearing, *see* FED. R. APP. P. 40, and on February 10, 2017, Tatum filed such a petition. The Seventh Circuit denied Tatum's petition on March 1, 2017. Thus, the period of delay from January 31, 2017 until February 10, 2017, is intrinsic to the case, and the period from February 10, 2017, through March 1, 2017, is attributable to Tatum. This period therefore does not count in the speedy trial analysis. *See Urdahl*, 286 Wis. 2d 476, ¶26.

¶33    The period between March 1, 2017, and May 30, 2017, also does not count in the speedy trial analysis. Pursuant to federal rules, the State had ninety days to seek certiorari review in the United States Supreme Court. *See* 28 U.S.C. § 2101(c); *see also* SUP. CT. R. 13. On May 30, 2017, the State filed its certiorari petition within the deadline. Because the period of delay between March 1, 2017, and May 30, 2017, was intrinsic to the case, the delay is excluded from the speedy trial analysis. *See Urdahl*, 286 Wis. 2d 476, ¶16.

¶34    The State's certiorari petition pended in the United States Supreme Court from May 30, 2017, until that court denied the petition on October 16, 2017. An appeal by the State "ordinarily is a valid reason that justifies delay" and does not weigh against the State if the basis of the appeal is reasonable. *See Loud Hawk*, 474 U.S. at 315.

¶35    Tatum asserts that the State did not have a reasonable basis for an appeal to the Supreme Court because he prevailed in the Seventh Circuit under a strict standard that required him to prove that no "fairminded jurists" could agree with the Wisconsin trial court's decision. *See Tatum IV*, 847 F.3d at 464. Tatum's victory in the Seventh Circuit, however, does not mean that the State acted unreasonably in seeking certiorari review in the United States Supreme Court. We

remind Tatum that not only the Wisconsin state courts at every level but also the federal district court rejected his arguments. The State therefore proceeded reasonably in asking the United States Supreme Court to consider the claims he made. Moreover, when the Seventh Circuit granted the State's motion to stay the mandate in *Tatum IV* pending the State's petition for certiorari review, the Seventh Circuit itself indicated that, in its view, the State had "demonstrate[d] a reasonable probability that four Justices [would] vote to grant certiorari and that five Justices [would] vote to reverse the judgment." *See Senne v. Village of Palatine*, 695 F.3d 617, 619 (7th Cir. 2012) (Ripple, J., in chambers). Accordingly, the period between May 30, 2017, and October 16, 2017, does not count in the speedy trial analysis.

¶36 The Supreme Court denied certiorari review on October 16, 2017, the Seventh Circuit reinstated its mandated on October 17, 2017, and on October 25, 2017, the Wisconsin trial court entered an order scheduling a hearing. On November 13, 2017, the Wisconsin trial court vacated Tatum's convictions. We view the period between October 16, 2017 and November 13, 2017 as intrinsic to the litigation and therefore we exclude it from the speedy trial analysis. Were we to include that period, however, it would add a mere twenty-eight days to the calculation. Adding twenty-eight days to the seventy-seven-day period between November 13, 2017, when Tatum again enjoyed a presumption of innocence, and the start of his trial on January 29, 2018, yields a total of 105 days of delay, well below the one-year threshold necessary to give rise to a presumption of prejudicial delay. *See Borhegyi*, 222 Wis. 2d at 510. Consideration of the remaining *Barker* factors is not required. Tatum did not suffer a violation of his constitutional right to a speedy trial.

¶37 Tatum next argues that he is entitled to dismissal of the homicide charges because, on February 13, 2017, following the release of *Tatum IV*, he filed

15

a speedy trial demand in the Wisconsin trial court under WIS. STAT. § 971.10, and the trial court failed to hold his trial within ninety days thereafter. *See* § 971.10(2) (requiring trial within ninety days of a written demand in a felony case). Tatum misunderstands the mechanics of § 971.10. Assuming without so holding that Tatum has alleged a violation of § 971.10(2), the only remedy for a violation of that statute is release from either pretrial custody or from the conditions of bond pending trial. *See **State ex rel. Rabe v. Ferris***, 97 Wis. 2d 63, 68, 293 N.W.2d 151 (1980); *see also* § 971.10(4). Because Tatum has already had his trial, however, any right to pretrial release is moot. *See **Dane Cnty. v. Sheila W.***, 2013 WI 63, ¶4, 348 Wis. 2d 674, 835 N.W.2d 148. Accordingly, we reject this claim for relief.[12]

¶38    Last, Tatum contends that the trial court's evidentiary rulings deprived him of the constitutional right to present a defense. Whether a trial court's evidentiary rulings abridged a defendant's right to present a defense is a question of constitutional fact for our *de novo* review. *See **State v. Stutesman***, 221 Wis. 2d 178, 182, 585 N.W.2d 181 (Ct. App. 1998).

¶39    "The Sixth Amendment and Due Process Clause right to present a defense requires that a defendant be allowed to introduce relevant evidence, subject to reasonable restrictions. A defendant's right to present a defense is not absolute." ***State v. Campbell***, 2006 WI 99, ¶33, 294 Wis. 2d 100, 718 N.W.2d 649 (citation and emphasis omitted). Under article I, section 7 of the Wisconsin Constitution, a

---

[12] Tatum alleges in his reply brief that the State has misstated his claim by asserting that he alleges a violation of his statutory right to a speedy trial. Tatum reminds us that he seeks dismissal on the ground that the circuit court lost competency to proceed by not affording him a trial within the ninety days described in WIS. STAT. § 971.10(2). His purported clarification does not aid him. Regardless of the theory on which Tatum rests his claim for dismissal, the outcome is the same. The sole remedy for noncompliance with the statute is pretrial release, *see **State ex rel. Rabe v. Ferris***, 97 Wis. 2d 63, 68, 293 N.W.2d 151 (1980), and the claim is now moot.

defendant has the same right to present relevant evidence, subject to the same restrictions, as is afforded under the federal constitution.[13]  *See **State v. Sarfraz***, 2014 WI 78, ¶37, 356 Wis. 2d 460, 851 N.W.2d 235.  Indeed, "[t]here is no abridgement on the accused's right to present a defense, so long as the rules of evidence used to exclude the evidence offered are not arbitrary or disproportionate to the purposes for which they are designed."  ***State v. Muckerheide***, 2007 WI 5, ¶41, 298 Wis. 2d 553, 725 N.W.2d 930.  The ***Muckerheide*** court explained: "[w]hen evidence is irrelevant or not offered for a proper purpose, the exclusion of that evidence does not violate a defendant's constitutional right to present a defense."  ***Id.***, ¶40.

¶40     Tatum argues that he sought to present a defense of "outrageous government conduct" so as "to challenge the reliability and credibility of the State's case."  He says that he offered a theory that "State actors first assisted 'snitches' in fabricating alleged 'confessions,' then intentionally denied [Tatum his] rights"—specifically, his right to self-representation—"and falsified appeal transcripts to cover it up."  He argues that "proof that State actors engaged in falsifying evidence and cover up makes the State's case and evidence less credible and reliable" and that evidence of the alleged falsification and cover up is relevant.  He goes on to argue that the trial court erred because it "ruled that only [Tatum] could testify to the outrageous government conduct, denying all corroborating evidence."

¶41     Tatum clearly misstates the record in asserting that the trial court limited him to presenting only his own testimony.  Tatum called several detectives to the stand to testify about the investigation.  He also presented the testimony of a

---

[13] Tatum does not suggest that his right to present a defense is subject to different analyses under the federal and state constitutions and we decline to develop an argument for him.  *See* ***State v. Pettit***, 171 Wis. 2d 627, 647, 492 N.W.2d 633 (Ct. App. 1992).

former inmate—White—that the State elected not to call, and Tatum examined White at length about the statement he gave to police in regard to Tatum's alleged confession. Thus, Tatum in fact had an opportunity to present evidence that corroborated his theory of defense.[14]

¶42 The trial court did bar some evidence that Tatum sought to present. We turn to Tatum's challenges to the propriety of those rulings.

¶43 A trial court has "'broad discretion to admit or exclude evidence.'" *State v. Nelis*, 2007 WI 58, ¶26, 300 Wis. 2d 415, 733 N.W.2d 619 (citation omitted). We will uphold a trial court's evidentiary ruling as a proper exercise of discretion if the trial court "examined the relevant facts, applied a proper standard of law, used a demonstrated rational process and reached a conclusion that a reasonable judge could reach." *State v. Marinez*, 2011 WI 12, ¶17, 331 Wis. 2d 568, 797 N.W.2d 399 (citation omitted).

¶44 According to Tatum, the trial court wrongly excluded the recording of the jailhouse interview that police conducted with McCord. As we have seen, the trial court denied Tatum's request to play that recording for the jury because, when the parties and the circuit court listened to the recording, it refuted Tatum's allegation that a detective passed information to McCord and revealed that McCord's own attorney was the person who showed McCord a document about Tatum's case. In the face of that revelation, Tatum nonetheless sought to admit the recording as relevant to his theory of government misconduct. In Tatum's view, the recording showed that the police were aware that McCord saw materials related to

---

[14] As discussed earlier in this opinion, the trial court also ruled in a pretrial hearing that Tatum could present the testimony of a psychologist who, according to Tatum, altered his prison records. Tatum, however, did not call that witness.

Tatum's case and therefore, Tatum argued, the police must have provided "some sort of assistance" to witnesses in fabricating statements. The trial court rejected this thesis, explaining that "the inference the defense would like to create ... is not present." Accordingly, the trial court ruled that any theoretical relevance the evidence might have was at best "infinitesimally small" and was outweighed by the considerations of confusion and waste of time outlined in WIS. STAT. § 904.03. *See id.* (providing that potentially relevant evidence may be excluded if its probative value is substantially outweighed by competing considerations). Thus, the record shows that the trial court appropriately applied the rules of evidence to reach a reasonable conclusion. *See Marinez*, 331 Wis. 2d 568, ¶17. There is no error here.

¶45 The trial court additionally prohibited Tatum from presenting testimony from the judge who presided over his 2011 trial. Tatum argued that he was entitled to ask the judge about "glaring errors" that the judge allegedly made in admitting evidence, and Tatum suggested that the jury could then infer from the judge's answers that the judge had taken steps to ensure that Tatum would be found guilty. The trial court appropriately exercised its discretion in concluding that Tatum failed to show that the judge had relevant evidence to offer. *Cf. Liteky v. United States*, 510 U.S. 540, 555 (1994) (explaining that judicial rulings almost never support a claim of improper antagonism towards a party).

¶46 Tatum also sought to present testimony from the prosecutor who handled the 2011 trial, arguing that the prosecutor knew that statements from various witnesses were inconsistent. Therefore, Tatum contended, the prosecutor knowingly presented false testimony and did so because the legitimate evidence available was not sufficient to obtain a conviction. The trial court assessed this chain of inferences as "unlikely," again concluding that any theoretical relevance was substantially outweighed by the danger of confusing the jury and misleading it

19

about the fact and import of a prior trial. *Cf.* WIS. STAT. § 904.03. Moreover, the trial court concluded that Tatum could examine the allegedly inconsistent witnesses themselves about the information they provided and that he could also examine the investigating officers about the circumstances of the informants' disclosures. The trial court's analysis represents a proper exercise of discretion, and we will not disturb it. *See **United States v. Ashman***, 979 F.2d 469, 494 (7th Cir. 1992) (upholding a discretionary decision to deny a defense motion to call a prosecutor as a witness where the information sought was available from other sources).

¶47  Last, we consider Tatum's effort to present as witnesses the court reporters who transcribed the 2011 trial. Tatum argued that they would testify that they "fabricate[d] the transcripts on behalf or at the order or behest of [the original trial judge]." The trial court questioned Tatum regarding the basis for his belief that the court reporters would offer such testimony, and he responded that the transcripts contained errors that, in his view, were so numerous as to require "some kind of answers." After considering Tatum's argument, the trial court determined that Tatum had no basis to conclude that the court reporters would give the testimony he hoped to elicit and therefore excluded them as witnesses. ¶48 The trial court again properly exercised its discretion. Tatum's claim depended on allegations that the transcripts from the first trial contained errors, but Tatum failed to demonstrate any such errors. Instead, he pointed to affidavits apparently prepared by his mother and by a person claiming to be a courtroom observer, affidavits that he filed in 2011 with a motion to correct the appellate record for his appeal from the original convictions. This court denied his motion, explaining that Tatum failed to provide adequate support for his claims. *See **State v. Tatum**,* No. 2011AP2439-CR, unpublished order at 3 (WI App. Apr. 17, 2012). Our resolution of the motion is conclusive. *See **State v. Witkowski***, 163 Wis. 2d 985, 990, 473 N.W.2d 512 (Ct.

App. 1991). Moreover, were we to assume that Tatum could identify some significant error in the transcripts, we would nonetheless hold that the trial court properly exercised its discretion in barring him from calling the court reporters to testify, because Tatum's theory that the original trial judge ordered the court reporters to fabricate portions of the transcripts was entirely unsupported. Where a defendant offers no proof of a purely speculative theory, the trial court may bar the defendant from examining a witness on the topic. *See State v. McCall*, 202 Wis. 2d 29, 40, 549 N.W.2d 418 (1996). As our supreme court has explained, "the trial court has responsibility for seeing that the sideshow does not overtake the circus." *See id.* at 38 (citations and quotation marks omitted).

¶49 In sum, the trial court ensured that Tatum could present evidence in support of his theory of defense. At the same time, the trial court prevented him from presenting some witnesses that he wished to call because he failed to show that they had relevant evidence to offer and because any theoretical relevance was substantially outweighed by countervailing considerations of unnecessary delay, confusion of the jury, and waste of time. The record thus shows that the trial court protected Tatum's constitutional rights and properly exercised its discretion. Accordingly, we affirm.

*By the Court.*—Judgment affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.